**Byron Chastain DALE, Appellant,**

v.

**William J. JANKLOW, Jerry Baum, Patrick James Murphy, Larry Zwemke, Individually & in their official capacities, Appellees.**

**Byron C. DALE and Judith Dale, Appellants,**

v.

**William JANKLOW, individually and in his official capacity; Jerry Baum, individually and in his official capacity; Larry Zwemke, individually and in his official capacity; James Patrick Murphy, individually and in his official capacity; Mark Meierhenry, individually and in his official capacity; Dennis Holmes, individually and in his official capacity; Douglas Kludt, individually and in his official capacity; Thomas Del Grasso, individually and in his official capacity; Thomas Fahey, individually and in his official capacity; Ronald Johnson, individually; Northwestern Production Credit Association, individually; Don Gromer, individually and in his official capacity, Appellees.**

Nos. 86–5247, 86–5384.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1987.

Decided Sept. 10, 1987.

Rehearing Denied Oct. 28, 1987.

**482**

Wendy Alison Nora, Minneapolis, Minn., for appellants.

Mark W. Barnett, Pierre, S.D., for State of S.D.

Reed Rasmussen, Aberdeen, S.D., for Ronald R. Johnson.

Before LAY, Chief Judge, HEANEY, Circuit Judge and LARSON,* Senior District Judge.

LAY, Chief Judge.

These are consolidated appeals arising out of civil rights actions brought under 42 U.S.C. § 1983 (1982). Byron Dale is a South Dakota rancher who was indebted to the Production Credit Association (PCA) for some $400,000 arising out of loans provided by PCA to Dale. Under the terms of the loans, PCA could come onto Dale's property at a reasonable time and inspect the secured collateral (cattle and calves) without trespassing. The record shows that after Dale was granted the loans, he began branding calves with a new brand and laundering them through his son's ranch, thereby selling them free of the PCA lien. Dale also determined not to repay the loans in money but instead attempted in 1983 to tender a note payable in hay and silage. PCA rejected the tender and attempted to inspect the cattle. Dale refused to allow PCA officials onto his ranch, stating that "blood would run" before he would allow them on his property.

PCA brought suit in state court on October 18, 1982, to enforce its inspection rights and alternatively for possession of the cattle should the inspection reveal a default. Dale was served with an order to show cause and a temporary restraining order. At the hearing, Dale defended by asserting his "payment-in-kind"[1] note and PCA's refusal to accept tender. The court ordered Dale to allow PCA officials onto his property.

On October 28, 1982, Dale was again served with a state court order granting PCA a preliminary injunction and a restraining order specifically enjoining Dale from disposing of the secured collateral, including the calves. The same day, Dale told PCA officials to come to the ranch on November 3, 1982, rather than the previously scheduled October 29. Dale then began removing calves from his ranch. PCA eventually inspected the collateral and found a considerable shortage of livestock. It amended its complaint alleging a foreclosure action. By a state court order dated November 9, 1982, Dale was again enjoined from disposing of any secured collateral. At the subsequent hearing on December 8, 1982, Dale took the position that the order did not apply to the calves and that he did not have to account for them. The state court then granted PCA's application for appointment of a receiver.

On March 7, 1983, the state court granted PCA's motion for summary judgment, dismissed Dale's counterclaim, and denied Dale's motion for summary judgment. On March 13, after Dale had received the court's order, the calves were "rustled" from Dale's ranch. The receiver learned of their disappearance and reported it to the court. Noting that Dale had made widespread public threats about what would happen if PCA attempted to foreclose, the court directed county and state law enforcement officials to provide protection for the receiver. Officials informed the court that they could not ensure the receiver's safety in light of Dale's threats of

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. Dale asserted that there was no such legal tender known as a "dollar".

violence and bloodshed.[2] The court then determined, on the basis of the entire record, to issue an ex parte order directing the receiver to take immediate possession of the property already in the receiver's legal possession and to expedite the sale of the cattle without waiting for a regular execution sale.[3]

On March 18, 1983, state officials including Governor Janklow, State Highway Patrol Director Baum, and Officer Murphy, devised a plan to draw Dale away from the ranch so that the order could be executed peacefully. Dale learned of the plan, however, and returned to the ranch. Governor Janklow then telephoned Dale and attempted to dissuade him from resisting. Dale insisted that he would defend his property with his life. Director Baum and Officer Murphy arrived at the ranch to serve the court's order and ensure the safety of the receiver in executing that order. At the time that Director Baum and Officer Murphy were present, Dale was armed. During the course of their conversation, Officer Murphy hit Dale with a catsup bottle and after a struggle Dale was subdued.

On January 16, 1984, Dale initiated a civil rights action in the United States District Court for the District of South Dakota (Civil Case No. 84–3004). The suit named several defendants, including PCA, its various officers, directors, and employees. On January 23, 1984, Dale filed a pleading captioned "Amended Complaint" which included ninety-four named and unnamed defendants. The complaint was denied by United States District Judge Andrew Bogue under Rule 8 of the Federal Rules of Civil Procedure, on the ground that the complaint was "muddled, confusing, ambiguous, redundant, vague, verbose[; it was] impossible * * * to understand Plaintiff's alleged claim or claims." On March 30, 1984, Dale filed a second amended complaint which omitted PCA as a defendant. Thereafter, extended discovery and trial preparation took place on this complaint. PCA did not participate in any proceedings because it was not named as a party. In April of 1986, on the eve of trial, Dale filed a third amended complaint in which he named as additional defendants PCA and its officers and employees. Attached to it was a letter dated March 10, 1983, written by an attorney of PCA to an assistant attorney general of South Dakota, outlining means to enforce its foreclosure action. Dale's counsel relies upon this letter, not discovered by Dale until 1984, as having been fraudulently withheld. He alleges under this complaint a continuing conspiracy against him by the various party defendants. The federal district court, the Honorable Richard H. Battey, denied leave to amend. Thereafter, Dale filed a new complaint with the same allegations contained in his third amended complaint.[4] Judge Battey dismissed this complaint as being barred under the South Dakota statute of limitations. Trial proceeded on the merits of the March 30, 1984 complaint. At the conclusion of the plaintiff's evidence, the trial court directed a verdict against Dale.

On these consolidated appeals, four essential issues are raised: (1) whether there was abuse of discretion by the trial court in refusing leave to amend the complaint; (2) whether the trial court judge erred in refusing to recuse himself; (3) whether the trial court erred in dismissing the new com-

**2.** On a local radio talk show, Dale repeatedly threatened to fight foreclosure with his life. He also stated that he would carry his mini–14 rifle and shoot "as many of the sons-of-bitches" as he could.

**3.** Dale appealed the court's ex parte order. *Northwest S.D. Production Credit Ass'n v. Dale,* 361 N.W.2d 275 (S.D.1985), *cert. denied,* 475 U.S. 1126, 106 S.Ct. 1651, 90 L.Ed.2d 195 (1986). His argument centered around alleged procedural due process violations. In a thorough discussion of federal due process standards, the South Dakota Supreme Court held that the ex parte order did not violate due process because Davis had received repeated notice of the action in six prior court proceedings. The ex parte order was not the original notice of PCA's actions; it merely expedited the inevitable and was a legitimate course to take considering the exigent circumstances in the case. *Id.* at 279.

**4.** This complaint is identical in terms with the third amended complaint filed in No. 84–3004. *Dale v. Janklow,* Civil Case No. 86–5062. The dismissal of this complaint is the basis for Dale's appeal No. 86–5384, consolidated herein.

plaint; and (4) whether the trial court erred in directing a verdict.

The focus of Dale's appeal is that the district court erred in granting the motions for a directed verdict against him in his suit based primarily on use of excessive force by the officers when securing the cattle for the receiver's possession.[5] This issue presents a close question on review.[6] As noted by the district court, the better practice, as a general rule, would have been for the district court to permit the trial to be completed. As we have stated on prior occasions, if the jury reached an incorrect verdict, the trial court could still issue a judgment notwithstanding the verdict and we would thereby obviate the need for a new trial if error had, in fact, been committed. *See, e.g., Dace v. ACF Indus., Inc.,* 722 F.2d 374, 379 n. 9 (8th Cir.1983).

The standards for granting a directed verdict and a judgment notwithstanding the verdict are the same under federal law. *Nebraska Pub. Power Dist. v. Austin Power, Inc.,* 773 F.2d 960, 968 (8th Cir.1985); *SCNO Barge Lines, Inc. v. Anderson Clayton & Co.,* 745 F.2d 1188, 1192 n. 5 (8th Cir.1984). A directed verdict "should be granted only when all the evidence points one way and is susceptible of no reasonable inferences sustaining the posi-

tion of the nonmoving party." *Bell v. Gas Serv. Co.,* 778 F.2d 512, 514 (8th Cir.1985). *See also Barclay v. Burlington N., Inc.,* 536 F.2d 263, 267 (8th Cir.1976); *Gabauer v. Woodcock,* 520 F.2d 1084, 1091 (8th Cir. 1975), *cert. denied,* 423 U.S. 1061, 96 S.Ct. 800, 46 L.Ed.2d 653 (1976). On review by this court, the lower court's grant of a directed verdict is not accorded the usual presumption in favor of correctness. *Wilson v. City of N. Little Rock,* 801 F.2d 316, 320 (8th Cir.1986).

The guidelines for evaluating whether excessive force has been used are clearly set forth in this circuit:

In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Bauer v. Norris,* 713 F.2d 408, 412 (8th Cir.1983) (quoting *Putman v. Gerloff,* 639 F.2d 415, 420 (8th Cir.1981)) (quoting in turn *Johnson v. Glick,* 481 F.2d 1028, 1033

---

5. Although not asserted and not briefed by any of the parties on appeal, there was a discussion at oral argument concerning the propriety of Dale's arrest. Dale was arrested for obstructing law enforcement officers and resisting legal process. His conviction for this arrest was affirmed by the state Supreme Court. *State v. Dale,* 379 N.W.2d 811 (S.D.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1651, 90 L.Ed.2d 195 (1986). The issue of the validity of an arrest following a proper conviction has long been laid to rest:

He may be arrested for a very heinous offence by persons without any warrant, or without any previous complaint, and brought before a proper officer, and this may be in some sense said to be "without due process of law." But it would hardly be claimed, that after the case had been investigated and the defendant held by the proper authorities to answer for the crime, he could plead that he was first arrested "without due process of law."

*Ker v. Illinois,* 119 U.S. 436, 440, 7 S.Ct. 225, 227, 30 L.Ed. 421 (1886); *see also Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) ("Nor do we retreat from the estab-

lished rule that illegal arrest or detention does not void a subsequent conviction."). Additionally, counsel for Dale concurred in the trial court's ruling that the officers were legitimately at the Dale ranch. Thus, the propriety or lack of propriety of Dale's arrest is not a cognizable issue in this appeal.

6. The first three issues asserted on appeal may be dispensed with summarily. Dale asserts no grounds to support a finding of abuse of the trial court's discretion, as would be required in order to reverse a district court's refusal to permit amendment of his complaint. *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1125 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). Second, Dale's asserted bases for recusal are all grounded in adverse judicial rulings; there is no demonstration of bias stemming from an extrajudicial source. *See United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *United States v. Jones,* 801 F.2d 304, 312 (8th Cir.1986). Third, the district court correctly dismissed Dale's new complaint as barred by the statute of limitations. S.D. Codified Laws Ann. § 15–2–15.2 (Rev.1984).

(2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

■ We also note that the officers' conduct must sufficiently cross a constitutional line so as to create a federal cause of action under section 1983. Not every assault or bodily harm caused by a police officer means that a constitutional claim may be asserted. In order to violate the due process clause, the conduct must be so egregious and reckless that it may be deemed a substantive denial of due process. The Supreme Court, in a line of cases from *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), to *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1147, 89 L.Ed.2d 410 (1986) ("We do not question that * * * facts more egregious than those presented here * * * might rise to a level of a due process violation.") has set forth the guidelines for due process claims.

■ Although Dale did not physically threaten the officers who were at his ranch to execute the state court's order, the officers reasonably concluded that Dale would use deadly force to prevent the execution of the court's order, and was capable of doing so. In order to examine the reasonableness of the force used against Dale, it is essential to understand the officers' perceptions of the situation. This necessitates a review of both the events before March 19, 1983, and what occurred at the Dale ranch when the officers arrived.

Prior to March 19, 1983, Dale had been quoted in numerous articles as stating that he would defend his farm with his life. There was testimony that the officers had read many of these articles, and believed that Dale meant what he had said. Additionally, Gordon Kahl had stayed at the Dale ranch in January of 1983; and Dale stated to federal officers who were looking for Kahl in late February of 1983 that he would hide Kahl at his ranch if he came there.[7]

By the end of 1982, the state court had appointed a receiver for Dale's cattle, but authorized the receiver to leave them on the ranch. *Northwest S.D. Prod. Credit Ass'n* [8] *v. Dale*, South Dakota Circuit Court CIV82–31, Order of March 18, 1983, at 1. On March 13, 1983, 191 calves were rustled from Dale's herd. The receiver could not protect the remaining herd at the ranch, so on March 18, 1983, the state court issued an ex parte order that the receiver take physical possession of the cattle.

The proposed meeting between Dale and Attorney General Meierhenry was cancelled, because Dale learned of its diversionary intent and returned to his ranch. Director Baum [9] and Officer Murphy drove to the ranch in a final effort to try to talk Dale into peacefully permitting the state court's order to be executed.

---

7. Gordon Kahl was a tax protester. On February 13, 1983, just a month prior to the events of this suit, Kahl and others had killed two U.S. Marshals in North Dakota. Kahl had escaped, and remained a fugitive at the time that the officers approached the Dale ranch. For a complete description of those events see *United States v. Faul*, 748 F.2d 1204 (8th Cir.1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985). Thus, Dale's statement just weeks prior to March 19, 1983, that he would hide Kahl if he appeared, created a reasonable apprehension on the part of the officers concerning Dale's prior threats.

8. This company was the predecessor of PCA.

9. Baum, Director of the South Dakota Highway Patrol, had met with Dale on March 11, 1983. Director Baum testified to the following concerning that earlier meeting:

Q. [By Defense Counsel] During the course of the meeting did Mr. Dale discuss with you about his willingness to die and discussions of death and his family?
A. [By Director Baum] Yes.
Q. What did he state? What did you state?
A. He stated he was willing to die. We discussed his family being present. And he stated he was willing to die and he had discussed that with his family and they had concurred in that decision.
Q. Did you ask Mr. Dale why he did not just appeal Judge Tschetter's order?
    *    *    *    *    *    *
A. Yes. I asked him why he felt—or why he did not appeal the judge's ruling, because he said that the judge had erred or it was illegal what the judge had done; and he stated that he felt that all the judges were paid off and that this was his only recourse.
Transcript at 475. Thus, Director Baum had personal knowledge of Dale's willingness to die defending his property.

When they parked at the ranch, no one greeted them; thus, they had to consider the possibility of an ambush. When they entered the porch, they still saw no one, but two or three guns were next to the door of the house. Dale was on the phone and waved them into the house. He asked Director Baum to take a seat, but Director Baum refused because Dale had a mini–14 rifle laying on the kitchen table and pointed at the chair. Director Baum sat down after Dale moved the mini–14. Director Baum observed that Dale also was carrying a gun in a shoulder holster. Director Baum's testimony also demonstrates his belief that he was in an extremely dangerous situation:

Q. [By Plaintiff's Counsel] Would you consider yourself to be in a live-threatening [sic] situation?

A. [By Director Baum] I certainly did.

Q. What did you base that on?

A. From all the statements that he had made prior to it. I had nothing to indicate to me that he was going to cooperate. I think the situation we discussed in great length was to whether it was even feasible for us to go in the house for fear we could be taken hostage in that type of situation, but we had no other alternatives available to us. We felt the only recourse we had was to go in one last time and visit with Mr. Dale to see if it could not be concluded without any use of force.

Transcript at 355–56.

At one point Officer Murphy was permitted to examine Dale's mini–14. However, Director Baum stated that he did not know if he would be able to draw his gun before Dale drew his own. Although Dale attempts to enlarge the significance of these events, it is apparent that Director Baum was trying to avoid having to shoot Dale.

Officer Murphy testified that he was an expert in the martial arts, and had carefully analyzed the situation:

Q. [By Plaintiff's Counsel] Would you please tell the jury what sort of options you considered to take Byron Dale out?

A. [By Officer Murphy] The problem that I faced with Byron Dale was the fact he was across the table from me and I couldn't really get very close to him, plus the fact that I could observe he was armed with a shoulder holster, a military-style holster, which placed the weapon right here. It was very accessible and very quick to draw.

The problem I also faced was the emotional state Byron was in. I didn't know if I could get ahold of him close enough to grab him to where he wouldn't go for the weapon. I needed some way in order to cover the distance where I could get my hands on him, to get him tied up and restrained to where he could be cuffed and disarmed.

I knew at that particular point in time I was going to need—needed some way in order to stun so I could accomplish that feat without being shot.

Transcript at 565–66. This analysis included what to use to subdue Dale, where to hit him on his body, and how the blow should be delivered in order to be certain that Dale would not be seriously injured. As a result of these considerations, the blow [10] Officer Murphy delivered did not stun Dale sufficiently to enable Officer Murphy and Director Baum to immediately control and cuff him. Dale grabbed Officer Murphy's testicles, kicked Officer Murphy in the head two or three times, and had his fingers over Director Baum's eyes in an attempt to gouge them out. Dale was eventually handcuffed, and placed under arrest.

We hold that the district court correctly granted the motions for a directed verdict for the defendants. Although few cases have considered the propriety of a decision of reasonable force as a matter of law, there is support for this position. *Singer v. Wadman*, 745 F.2d 606 (10th Cir.1984) (affirming grant of summary judgment; police justified in killing Singer because of prior threats of "blood shed" and resisting arrest), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 785 (1985). This

10. Officer Murphy said he used a catsup bottle which was sitting on the kitchen table to hit Dale in the forehead.

court has stated that " '[f]orce can only be used to overcome physical resistance or *threatened force* * * *.' " *Bauer v. Norris,* 713 F.2d 408, 412 (8th Cir.1983) (quoting *Agee v. Hickman,* 490 F.2d 210, 212 (8th Cir.) (emphasis added), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3178, 41 L.Ed.2d 1143 (1974)). The record is replete with Dale's threats to prevent the authorities from taking the secured property, even if it cost him his life. Also, the fact that he was carrying a handgun in a shoulder holster and had a mini–14 rifle in front of him demonstrated that he was capable of carrying out his threats. We note that one member of the Supreme Court of South Dakota reasoned that the state officer should not have used the catsup bottle in an attempt to subdue Dale. It is perhaps easy for this court to agree, using hindsight to reinforce our view. On the other hand, what is reasonable force under the circumstances requires an objective standard placing a reasonable person into the same circumstances Officers Murphy and Baum faced. Whether a different, less violent means might appear more reasonable to the court is not the test. We believe the test for officers facing a life threatening situation must be whether the officers were objectively acting in good faith under the circumstances. We find that they were and affirm the district court.