UNITED STATES of America; Melvin White, Plaintiff,

v.

Natalee SCHAY; B. Jeffery Pence, Defendants.

Civ. Nos. 89–209, 89–633.

United States District Court, E.D. Arkansas, Little Rock Division.

Sept. 17, 1990.

P.A. Hollingsworth, Little Rock, Ark., for Melvin White.

Christopher T. Shaheen, U.S. Dept. of Justice, Civ. Rights Div., Housing & Civil Enf. Section, Washington, D.C., Michael T. Booker, Rose Law Firm, Little Rock, Ark., for U.S. (govt.)

Buddy Sutton, James W. Moore, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### I. *Statement of the Case*

On March 24, 1989, plaintiff, Melvin White, brought suit against defendants, Natalee Schay and B. Jeffery Pence, under the provisions of 42 U.S.C. § 1982 and Title VIII of the Civil Rights Act of 1968 (The Fair Housing Act), 42 U.S.C. § 3601 *et seq.*, alleging that the defendants discriminated against him because of his race by refusing to lease or rent to him certain real property owned by defendant, Pence, located in Little Rock, Arkansas. On August 2, 1989, the United States also brought suit against the defendants under the provisions of § 812(*o*) of the Fair Housing Act, as amended, 42 U.S.C. § 3612(*o*), seeking a declaration that the alleged acts of the defendants violated applicable provisions of the Fair Housing Act, and an injunction enjoining the defendants from further violations. Additionally, the United States prayed for damages in behalf of Melvin White.

Because Melvin White, a black lawyer, was, at the time of the incident which is the subject matter of this lawsuit, a law clerk for Chief Judge G. Thomas Eisele, the other Eastern District Judges who office in the same building with Judge Eisele, recused and the matter was assigned to the writer of this opinion. The case was tried in Little Rock to a six-person jury on June 27–29. The testimony in the case consumed over two days, and, at the close of the evidence, the jury was instructed and permitted to retire to deliberate. The jury

returned with a verdict in favor of the defendants after less than 30 minutes of deliberation.

## II. *Facts*

A great deal of the testimony elicited at the trial was not in dispute. Mr. White had been reared in Crawfordsville, a small town in Crittenden County in the Mississippi River delta region of Eastern Arkansas and had attended and graduated from public schools in that county. After graduation, at the age of 18, he enlisted in the United States Air Force and spent four years and nine months in the service. After discharge from the Air Force, he attended and graduated in 1984 with honors from Morehouse College in Atlanta. He then was admitted to and graduated from the University of Virginia Law School. In August of 1987, he was hired as a law clerk by Chief Judge G. Thomas Eisele, United States District Court, Eastern District of Arkansas, where he was employed at the time of this incident on September 29, 1988.

Early on the morning of that date, he saw an advertisement in the *Arkansas Gazette* newspaper offering to rent or lease a three-bedroom home. Since Mr. White was interested in changing his residence in Little Rock, he answered that advertisement by phone and made an appointment to visit the property located at 211 Linwood Court in the Pulaski Heights addition to Little Rock, admittedly one of the more desirable residential locations in that city. He talked with defendant, Schay, who agreed to meet him at the residence at 6:45 p.m. that evening. He says that he gave her during that telephone conversation his name and telephone number and that Ms. Schay told him she would call him if anything changed. At the trial, Ms. Schay did not remember, one way or the other, whether she had received that information or made that statement.

In any event, shortly before 6:45 p.m. on that date, as agreed, Mr. White journeyed to the residence. As he approached the residence in his automobile, Ms. Schay was waiting for him in front of the house. She walked to his car and asked him if he was Melvin White. When he replied in the af-

firmative, she told him without further elaboration that the house had already been rented. Mr. White asked if he would, nevertheless, be permitted to walk through the house to see what he was missing. He said that she was very cordial during that visit, and after he viewed the house, he told her that it was "exactly what he wanted" and asked her if she had similar properties available. She told him that she had an apartment available for rent in Jacksonville, Arkansas, near the Little Rock Air Force Base, but Mr. White was not interested since he worked in downtown Little Rock.

The evidence showed that Ms. Schay, who resided a couple of blocks from the 211 Linwood Court property, was the rental agent for defendant, Pence, and was responsible for the rental or leasing of approximately 20 separate properties owned by him, with substantial authority in that respect. She was paid a commission equal to 10% of the first month's rent on any of Pence's property she was responsible for renting.

Mr. White immediately suspected after the incident on the evening of September 29 that he was being denied the opportunity to rent the house because of his race, and doubted that it had been rented just prior to his arrival as claimed by Ms. Schay. On the morning of the following day at approximately 8:00 a.m., he discussed his experience of the previous evening with two of his co-workers in Judge Eisele's office and asked that they telephone the number listed in the advertisement and inquire about the house. It appears that at least two of the co-workers made such calls. At approximately 8:30 a.m., while Mr. White was engaged in a court hearing, he received word in the courtroom that his co-workers had called and had been told that the house was available. He immediately asked Judge Eisele for permission to leave the court hearing so that he could investigate the matter and, if necessary, file a formal complaint of discrimination. He learned that calls had in fact been made by his co-workers, including Jim Miskievicz, also a law clerk for

Judge Eisele, and a witness at the trial, who testified that he had, on the morning of September 30 at approximately 8:00 a.m. called the number listed in the newspaper advertisement and had talked with a woman named Natalee who advised that the property was still for rent. After leaving Judge Eisele's court Mr. White proceeded to "City Hall" to file a formal complaint of discrimination. On the way back to his office he visited the office of a friend, Clarence Roby, to discuss the incident. Mr. Roby testified that he also telephoned the number listed in the newspaper advertisement and was also told that the house was still available. Shortly after that, Mr. White telephoned Ms. Schay and without identifying himself asked if the house was still for rent and was told that it was. The evidence is uncontroverted that it remained available for rent until November 3, 1988, when it was finally rented to a white couple after the rent was lowered by Ms. Schay from $675.00 per month to $600.00 per month. She testified that the rent was lowered because the house had been vacant since June.

The evidence set forth above, with the minor differences noted, was not controverted by the defendants. However, Ms. Schay said that she had rented the home to either a couple or a person (it is not clear which she believed it to be) who visited the premises immediately before Mr. White arrived. She says that she then promised them (or him) that she would hold the property and that they were to go by Mr. Pence's office [1] the first thing the next morning to pay the deposit and sign the lease. While her version of what happened after that point has varied from time to time during the progression of this case,[2] her testimony reflected that she now seems to believe that the man who agreed to rent the property on the evening of September 29 was Frank Daley. She now says that Mr. Pence called her sometime around 9:00 a.m. on September 30, and advised her that the person who had agreed to rent the property had not appeared to pay the deposit and sign the lease, so she should continue her attempts to rent it. She now says that she may have received a couple of calls before Mr. Pence's call and that, if she did, she would probably have told them that the property had been rented but that the callers would have been told in any telephone calls made after Mr. Pence's call that the property was still for rent.

Defendants produced Mr. Frank Daley who testified that he had been a Little Rock fireman for 14 years prior to his dismissal from the Little Rock Fire Department in September of 1987 after he had been disciplined for dishonesty and making false statements defaming the fire department. Mr. Daley, whom the captain of the Little Rock Fire Department testified had a bad reputation for truthfulness and who "lacked the ability to tell the truth" testified that on approximately June 29 or 30, 1989, he read an article in the newspaper about the Melvin White lawsuit which had been filed in March. The article apparently described the events and the claim of the defendants that the property had not been offered to Mr. White because defendants believed that it had been rented the previous evening by an unnamed and unknown individual. He says that he realized that he was probably that individual so he called Ms. Schay and Mr. Pence the next day. Mr. Pence visited him and took him by the subject property. He gave a statement to Mr. Pence at the time claiming that he had, in fact, agreed to rent the property the evening of September 29 because he and his wife were "breaking up" at that time and she had told him to leave their home. He says that later that evening he and his wife discussed the matter and had "made up" so he no longer needed the property. He failed to advise either Schay or Pence of this fact, and simply did not contact them when he was supposed to have ar-

1. E. Jeffery Pence is an attorney with offices in Little Rock.

2. The discrepancy reflected in her version of the occurrence will be discussed in more detail in Part IV of this opinion.

rived to pay the deposit and sign the lease.[3]

### III. *The Law*

This court has, over the last several years, had occasion to consider the standard to be applied in ruling on motions for a new trial several times, and must confess that this court simply does not know with any certainty what standard is to be applied by trial courts in this circuit. The court respectfully believes that this confusion is occasioned by changing and shifting language contained in various opinions of the Court of Appeals for this circuit.

Defendants, in their briefs, contend that Rule 59 "gives the trial judge ample power to prevent what he considers to be a miscarriage of justice. It is his right and indeed his duty to order a new trial if he deems to be in the interest of justice to do so ...", quoting from 11 Wright & Miller, *Federal Practice and Procedure*, § 2803 at 31–32. Defendants point out that the Court of Appeals for this circuit in 1967 in the case of *Simpson v. Skelly Oil Co.*, 371 F.2d 563, 566–67 (8th Cir.1967), in comparing the standard for a motion for a new trial with the standard for a motion for a judgment notwithstanding the verdict, said: "On the motion for a new trial, however, [the court] has wider, though not unlimited, latitude and [it] may set the verdict aside where it is against the weight of the evidence, or to prevent injustice."

Defendants also point out that the Court of Appeals, in *Brown by Brown v. Syntex Laboratories, Inc.*, 755 F.2d 668, 673 (8th Cir.1985), defined the appropriate standard for granting a new trial on the basis of the weight of the evidence as: "In determining if a verdict is against the weight of the evidence, the trial court may conduct its own evaluation of the evidence. It may 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict' ". *Ryan v. McDonough Power Equipment, Inc.*, 734 F.2d 385, 387 (8th Cir.1984).

Indeed, those cases say that, and it appears that those cases and the Wright & Miller article quoted above set forth what is the law in most jurisdictions. However,

the court is not at all certain that that is the standard to be applied in this circuit or at least that it is not that simple.

Prior to the court's opinion in *Firemen's Fund Ins. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179 (8th Cir.1972), *cert. denied*, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973), the Court of Appeals expressed the standard to be applied in language similar to that quoted above. *See Bates v. Hensley*, 414 F.2d 1006 (8th Cir.1969). In *Slatton v. Martin K. Eby Constr. Co., Inc.*, 506 F.2d 505, 508 n. 4 (8th Cir.1974), *cert. denied*, 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975) the court said:

> In its review of the evidence when passing upon a motion for new trial, the trial court is not limited to viewing the evidence in the light most favorable to the prevailing party. It may weigh evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict.

*Citing Bates, supra.*

Additionally the court said in that opinion, at p. 508, that:

> We have traditionally given trial judges a large range of discretion in ruling on motions for a new trial particularly on the weight of the evidence, in recognition of the fact that they have heard the testimony and observed demeanor of the witnesses and are more aware of the community and its standards.

In this court's view, the standard to be applied by trial courts in ruling on Rule 59 motions as expressed in *Bates* and *Slatton*, and the standard for review of those rulings by appeals courts as expressed in *Slatton* are the proper ones and ultimately best serve the ends of justice. However, this court believes that cases subsequent to those raise a great deal of doubt, at least in this court's mind, that the standards stated in those cases for both considering a new trial motion and review of the trial court's decision have not been applied by subsequent cases and, in fact, do not appear to accurately state the present state of the law in this respect.

---

**3.** The court's view of the credibility of Mr. Daley will also be discussed in Part IV below.

This "problem" first arose in *Aalco Wrecking*. In that case the Court of Appeals said that the trial court may not grant a motion for a new trial unless it finds that the verdict is against the "clear weight", "overwhelming weight", or "great weight" of the evidence. This court believes that that changes the test, but if the court, in fact, means what it says in that opinion, the test might be even more severe. In *Aalco* the court, in deciding to overrule the trial court's granting of a new trial, said:

> The evidence is such that reasonable men may differ as to the result, therefore, the determination should properly be left for the jury.

*Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir.1972). Thus, it seems that any fair reading of *Aalco* would tell trial judges that Rule 59 motions should not be favorably considered unless the court can at least say that the jury verdict is against the clear weight, overwhelming weight, or great weight of the evidence, and perhaps that such a motion should not be granted if reasonable men can differ as to the result. It is noteworthy, that that language is used in the same opinion in which the court said, in another part of the opinion, that:

> Regardless of the rhetoric used, the true standard for the granting of a new trial on the basis of the evidence is simply one which measures the result and terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not.

*Aalco*, 466 F.2d at 187.

Since the decision in *Aalco* in 1972, the court has variously said that a trial court may not grant a motion for a new trial unless it finds that the verdict is against the "clear weight", "overwhelming weight", or "great weight" of the evidence in at least the cases of *Crowley Beverage Co., Inc. v. Miller Brewing Co.*, 862 F.2d 688 (8th Cir.1988); *McBryde v. Carey Lumber Co.*, 819 F.2d 185 (8th Cir.1987);

*Goldsmith v. Diamond Shamrock Corp.*, 767 F.2d 411 (8th Cir.1985).

This court might be persuaded that the Court of Appeals simply did not mean what it appeared to say in those cases and particularly that the court did not intend to merge the standard for considering motions for judgment notwithstanding the verdict made under Rule 50 with that to be used in considering Rule 59 motions for a new trial if it were not for the recent case of *Blake v. J.C. Penney Co., Inc.*, 894 F.2d 274 (8th Cir.1990). In that case, the court seemed to carry forward the *Aalco* theme that new trials should not be granted if reasonable minds could differ. In that case the court reversed the trial court's granting of a motion for a new trial and in doing so said, "reasonable minds clearly could have differed as to the proper result" and concluded that, thus "no valid purpose would be served by submitting this case to another jury". In saying that, the Court of Appeals, after overruling the trial court's granting of a judgment n.o.v., and in ruling on the trial court's conditional grant of a motion for a new trial as required by Rule 50, summarily also overruled the trial court's granting of a new trial, and in doing so said:

> Here, the district court granted the new trial for the same reason as that given for granting judgment n.o.v.: it's belief that neither direct nor indirect evidence sufficiently supported the jury's verdict. As discussed above, however, the record does not support the district court's conclusion. Indeed, given the evidence here, reasonable minds clearly could have differed as to the proper result. *See Washburn [v. Kansas City Life Ins. Co.]* 831 F.2d [1404] at 1410 [(8th Cir.1987)]. Accordingly, no valid purpose would be served by submitting this case to another jury. *See Fireman's Fund*, 466 F.2d at 187–88.

*Blake v. J.C. Penney Co., Inc.*, 894 F.2d 274, 281 (8th Cir.1990).

Thus, it appears that there can be no interpretation of the language used by the court in *Blake* other than that the standard for ruling on motions for judgment n.o.v.

and for a new trial are identical, and since the trial judge did not offer any additional factual basis for the granting of the motion for a new trial other than that offered in support of the granting of the judgment n.o.v., the motion for a new trial should likewise be denied. In other words, it appears that the Court of Appeals told trial courts in *Blake* that if the evidence is not deficient enough to grant a motion for a judgment n.o.v. it is also not deficient enough to grant a new trial. In this court's view, that is substantially a different test than had been expressed in cases such as *Slatton, supra* and *Bates, supra,* and in respected works such as the Wright & Miller article cited above.

Even if the Court of Appeals did not intend to merge the tests to be utilized in considering Rule 50 motions and Rule 59 motions, the court respectfully does not believe that it is consistent to say in one case or some cases that trial courts may "weigh the evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict" and in other cases say that a new trial shall not be granted unless the trial court finds that the verdict is against the "clear weight", "overwhelming weight", or "great weight" of the evidence and it is certainly inconsistent to say that a new trial will not be granted if the evidence is such that reasonable minds may differ. Is it possible for their to be "substantial evidence" and for that evidence to still be against the clear weight, overwhelming weight or great weight of the evidence? May a trial court "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict" but still be precluded from granting any new trial in any case where "reasonable men may differ as to the result"? This court thinks not.

This court respectfully also believes that the cases discussed above indicate that the Court of Appeals has moved substantially away from the test for reviewing trial court's granting of new trials as expressed in *Slatton, supra.* Those cases do not indicate to this court that the Court of Appeals gives trial judges "a large range

of discretion in ruling on motions for new trial" because the trial court had "heard the testimony and observed demeanor of the witnesses and are more aware of the community and its standards". In fact, as the writer of this opinion said in a dissent in *Morgan v. Arkansas Gazette,* 897 F.2d 945 (8th Cir.1990), a case in which this court sat by designation, any trial judge who reads the cases cited above must wonder whether such trial courts are being told that they are at least foolhardy to even think about granting motions for a new trial or for judgment n.o.v. The message of cases such as *Blake* seems to be that trial courts should believe that reasonable jurors may have been able to conclude as they did simply because they did and that trial judges should deny all motions for judgment n.o.v. and motions for a new trial and if they don't they will get the case back so that they can "do it right".

In the case before this court, for the reasons to be discussed below, if this court believed that it, in ruling on the motion for a new trial, would be granted the latitude and deference expressed in cases such as *Bates* and *Slatton* which are the standards that appear to be applied in most jurisdictions, the court would have no difficulty, after weighing the evidence and considering the credibility of the witnesses, in saying that the motion for a new trial should be granted because the court is convinced that a miscarriage of justice has taken place. However, for the reasons discussed above, the court does not believe that those cases any longer correctly state the standard that the Court of Appeals has told trial courts is to be applied in ruling on motions for a new trial, nor is the Court of Appeals giving the decisions of the trial courts in this respect anywhere near the deference accorded trial courts by the standard of review expressed in *Slatton.*

■ In short, the court has reluctantly concluded that, in considering the evidence in this case, it must utilize a much more restrictive view than the one utilized in most jurisdictions and apparently used in this circuit until at least *Aalco.* It is not at all clear that this court may weigh the

evidence and determine the credibility of the witnesses and, after doing so, grant a new trial because the court is convinced that a miscarriage of justice has occurred, at least unless it can also say that the verdict is against the "overwhelming weight", "clear weight", or "great weight" of the evidence. Additionally, as expressed above, if the court means what it said in *Aalco* and intends what it did in *Blake*, it may be that a new trial cannot be granted unless it would be proper to grant a judgment n.o.v.

## IV. *Discussion and Ruling*

■ As discussed above, the evidence is uncontroverted that the defendants failed to rent the property at 211 Linwood Court to Mr. White when he attempted to rent it on September 29, 1988, and that it remained on the market for rental until November 3, 1988, when the rent was reduced and the property rented. Thus, it is clear that Mr. White proved a prima facie case at least by the indirect evidence method delineated in cases such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Additionally, the court believes that the admitted facts set forth above establish a prima facie case by direct evidence.[4]

Thus, it was incumbent upon the defendants to come forward with evidence to explain that their actions, which appeared to be discriminatory, were, in fact, not discriminatory. While a number of witnesses were called, the two witnesses that testified directly on this issue were defendant Schay and Frank Daley. The court believes that there is a great deal of question about the credibility of either of these witnesses, and if trial courts are, in fact, permitted to "weigh the evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict", when after doing so the court is convinced that a "miscarriage of justice" has occurred and, if the trial court's decision in this respect is given the deference indicated by *Slatton, supra,* then a new trial should be granted in this case. The testimony of Ms. Schay is filled with inconsistencies. Her "story" seemed to change as she learned more about plaintiff's case. The uncontroverted evidence is that Ms. Schay, immediately upon seeing Mr. White at the residence, told him that the property was rented. After learning that a complaint of discrimination had been filed, her initial version of the events was that a "white couple" visited the residence immediately before Mr. White and it had been rented to them. She was interviewed on February 22, 1989, by investigators for the governmental agency responsible for enforcing compliance with the Fair Housing Law, and in respect to that interview, she prepared, in her own words, and executed an affidavit which she typed some time between the day of the interview and the following morning. In that affidavit she swore that the house had been rented to a "couple" and that "the next day we told the phone callers that the house had been rented". One of the investigators, Darlene Chaney, testified that Ms. Schay told her in the February 22 interview that the house had been rented by a "white couple" testimony that Ms. Schay does not dispute, and that any callers the next morning were told that the property had been rented. Ms. Chaney testified that Ms. Schay told her that she received a call sometime in the afternoon of September 30 from Mr. Pence advising that the prospective renters had not paid the deposit or signed the lease so the property should be placed back on the market.

Ms. Schay's initial explanation was, of course, directly contradicted by the testimony of Mr. Miskievicz and Mr. Roby, each of whom called on the morning of September 30 and were told that the house was still available. Apparently sometime after February 22, 1989, Ms. Schay learned that these telephone calls had been made, and her explanation of the sequence of events changed significantly. In her deposition which was taken on August 10, 1989, Ms.

4. For a discussion of the alternative methods (direct evidence or indirect evidence of proving discrimination) *see Perry v. Kunz,* 878 F.2d 1056 (8th Cir.1989).

Schay decided that the phone call from Mr. Pence had been received early on the morning of September 30, instructing her to continue to attempt to rent the house, and she said that callers who contacted her on that morning were told that the house was available. Not only do these statements appear to be inconsistent, Ms. Schay admitted at the trial that they were and that she had "changed her story" but that her version given at the trial was the correct one.

One aspect of her version remained consistent for almost exactly ten months. As indicated, in her affidavit she referred to "the couple" that was supposed to have rented the house immediately before Mr. White visited the property. In fact, this description of the putative renters was a description used consistently in pleadings filed by the defendants. Their answer was filed on April 10, 1989, and they alleged that "defendant, Schay, had agreed to rent the house in question to a family" and that when "the man and his wife failed to make their down deposit the following morning" the property was placed back on the market. In their answers to interrogatories dated April 20, 1989, the defendants referred to the prospective renters in the plural, and stated that they were unable to provide the name of "the individuals" who they say agreed to rent the house on the evening of September 29.

Then, on June 29 or 30, 1989, Frank Daley appeared almost "out of the blue" and Ms. Schay's story again changed significantly. Although she agreed at the trial that she did not recognize Mr. Daley when he appeared on the scene she, at least at the trial, readily accepted his story and decided that the "white couple" and "family" that she had said up to that point had agreed to rent the property, now became an "individual" or a "he" or a "him" and she no longer remembered that the prospective renters were a couple or a family.

Those inconsistencies, coupled with the fact that the evidence indicates that, immediately upon seeing Mr. White she told him that the property was rented, causes this court to doubt her present version of the event. That concern is significantly amplified by the fact that, even though Ms. Schay knew that Mr. White was interested in renting the house, she made no attempt to contact him even though it had been vacant since the previous June and remained vacant until the rent was reduced and it was rented on November 3, 1988. Her explanation was that she did not believe that she took or had his telephone number.

In respect to the testimony and actions of Frank Daley, it might be an exaggeration to say that he was the least credible witness appearing in this court during the last nine years that the writer of this opinion has held this office, but he would certainly be within the top five. As some evidence of his performance on the stand, it appears that defendants by the end of the trial wanted to distance themselves from him. In their answer to the second set of interrogatories filed after he appeared on the scene, Ms. Schay swore, in respect to the identity of the prospective renter, that "Frank Daley contends that he is that person and I have no reason to doubt that". However, when the court submitted to the defendants the proposed set of instructions, Instruction No. 9 contained a sentence which read: "Specifically, defendants have asserted that another person, Frank Daley, had made a commitment to rent the house shortly before Melvin White arrived at the house." During the court session, on the record, in which the attorneys are permitted to make comments and objections to the instructions, defendants requested that Mr. Daley's name be stricken from the instruction, and it was.

The court did not find Frank Daley's testimony to be credible for numerous reasons. In the first place, the very circumstances of his appearance on the scene raises questions. He claims that he read a newspaper article about the lawsuit in late June and on either June 29 or 30, 1989, he called Ms. Schay and Mr. Pence and advised them that he was the person who had agreed to rent the house and did not follow through with the requirements. Additionally, the evidence showed that he had been terminated by the Little Rock Fire Department after being disciplined for dishonesty

and making false statements, and his immediate supervisor, Captain Johnny Rief of the Little Rock Fire Department, testified that he had a bad reputation for truthfulness in the department and that his personal opinion was that Mr. Daley "lacked the ability to tell the truth".

These factors certainly would raise concern about the credibility of the witness, and his actual testimony did not remove that concern. His story was that he and his wife had had a "fight" shortly before the September 29 occurrence and that she had "kicked him out". He said that he and his wife were having a house built in Little Rock and that they had signed a $96,000 mortgage for their new home on September 20, 1988. He says that on the evening of the occurrence he was still residing in a duplex owned by him because his wife would not let him live with her and wanted a divorce. He testified that he had already promised the duplex to some renters and had to find a place to live. It was his testimony that he was in the rental market for only one day and looked only at the property which is the subject matter of this lawsuit, a three-bedroom house. He says that he wanted a three-bedroom house because he anticipated sharing it with unidentified and unnamed roommates. He claims that he made the call himself to set up the appointment and never told his wife at the time that he was going to rent the house and went alone to see it. He agreed to rent the house, but that very evening he and his wife reconciled and he no longer needed the home.

Other testimony raised additional questions about Mr. Daley's truthfulness. Dan Carter, the person in charge of the construction of the Daley home, testified that the Daley's moved into the house together within two or three days after the closing on September 20, 1988. He saw no signs that the Daleys were having marital problems and said that they had been so anxious to move into their new home that they attempted to move in before the closing and Mr. Carter had to call the police to keep them out. He testified that after working with Frank Daley every day for four months or so, he concluded that Daley was not a truthful person.

Additionally, there was testimony that collaterally attacked his credibility, including his admission that he had filed a petition to proceed in forma pauperis in the United States Court of Appeals for the Eighth Circuit in respect to his appeal of his termination by the Little Rock Fire Department, at the very time that he was building a home which cost at least $96,000 and that, within three days after he claimed he committed to rent the house at 211 Linwood Court, he wrote another letter to the Eighth Circuit claiming that he had no funds and did not anticipate having any until he received a tax rebate in the spring. This is obviously inconsistent with his assertion that he had sufficient funds to pay the deposit and rental on the Linwood Court property.

Mr. Daley's testimony and performance on the stand is powerful support for the wisdom of the statement made in *Slatton, supra*, that appeals courts, in ruling on decisions by trial courts to grant new trials on the basis of the weight of the evidence, should give such rulings due deference "in recognition of the fact that they have heard the testimony and observed demeanor of the witnesses and are more aware of the community and its standards". It is impossible to express in "cold print" the feeling that this court had about Mr. Daley's credibility after viewing him testify. At the end of his testimony, the court was convinced that his testimony should have been given no weight by the trier of fact.

For all of the above reasons, if this court really is permitted to "weigh the evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict", *Slatton, supra*, at 508, then this court would disbelieve Ms. Schay's version and Mr. Daley's almost magical appearance upon the scene, and determine that, based upon the weight of the evidence, a miscarriage of justice has occurred. However, for the reasons already stated, the court is not certain that it is permitted to do so, in view of the cases discussed above.

In *Blake, supra,* a case out of this court, the Court of Appeals seemed to say that a motion for a new trial should not be granted if there was sufficient evidence to prevent the trial court from granting a judgment n.o.v. In this case there is certainly evidence from which reasonable jurors could differ as to the result. While this court would not do so, it is certainly not inconceivable that reasonable people would not view Ms. Schay's changing version or Mr. Daley's testimony as this court did. Since that is true, there is certainly no basis for granting a judgment n.o.v. and, thus, in the words of *Blake,* the trial court should not draw "conclusions which should have remained with the jury."

Even if the Court of Appeals for this circuit did not intend to say what it seemed to say in *Blake* and at least in one sentence in *Aalco,* it appears that this circuit is at least committed to the proposition that trial courts shall not grant new trials on the basis of the weight of the evidence unless the court can say that the jury verdict is against the "clear weight", "overwhelming weight", or "great weight" of the evidence. *See Firemen's Fund, supra,* at 186–87; *Goldsmith v. Diamond Shamrock Corp.,* 767 F.2d 411, 416 (8th Cir.1985); and *McBryde v. Carey Lumber Co.,* 819 F.2d 185 (8th Cir.1987). Even if that is the law in this circuit, this court cannot say that the evidence or lack of it meets that test. Unless this court is permitted to completely disregard and disbelieve the testimony of Ms. Schay and Mr. Daley, then the court cannot say that that test has been met. This is true because, on one side of the "scales of justice" we have the facts of the occurrence and Ms. Schay's actions in respect to it, and on the other side, we have her complete and absolute denial that her actions were in any way intended to discriminate against Mr. White, and her explanation for why she acted as she did, supported by the testimony of Mr. Daley. If, by "great weight", "clear weight", or "overwhelming weight", the Court of Appeals meant that trial courts are to look at the scales and determine that they must be weighted heavily in favor of the movant before a motion for a new trial can be

granted, that simply does not exist in this case, unless the trial court is permitted to remove from one side of the scales the testimony of Ms. Schay and Mr. Daley. The court does not understand the present law in this circuit to permit that.

Additionally, there is a practical reason why this court does not intend to grant the motion for a new trial in this case. While some might recognize that this is not totally intellectually honest, experience has taught that the granting of motions for new trial on the weight of the evidence have not fared well on appeal in this circuit. Unfortunately, the granting of such a motion is not normally appealable, so the trial court and the litigants are required to try the case again before it can be determined whether the Court of Appeals agrees with the granting of the motion. A quick perusal of the cases indicates that the odds probably are that if a new trial is granted on the basis of the weight of the evidence, it probably will not be affirmed, and the time and expense necessary to try the case again will have been wasted. On the other hand, if, after viewing this court's opinion in this case, and the record as a whole the Court of Appeals determines that this court has applied the wrong standard or that the deficiencies in the evidence meets the current standard, then the Court can simply say so and the case can be retried with some certainty that the time and expense necessary to do so will not have been wasted. While the court does not "like" this approach, it is akin to what the Court of Appeals has suggested on more than one occasion in respect to a court's granting of a motion for judgment n.o.v. *See Dace v. ACF Industries,* 722 F.2d 374 (8th Cir. 1983); and *Dale v. Janklow,* 828 F.2d 481 (8th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988).

Frankly, the court hopes that the Court of Appeals will take this opportunity, if it has the opportunity to do so, to clearly set forth the standard that trial courts are to utilize in ruling on motions for a new trial. For the reasons stated, the court respectfully believes that the cases discussed above, or at least some of the statements

contained in them, are inconsistent and confusing, at least to this court.

The motion for a new trial will be denied by separate order.