Norman Douglas NORWOOD,

v.

**SOLDIER OF FORTUNE MAGAZINE, INC., A Colorado Corporation, A Subsidiary of Omega Group, Ltd., A Colorado Corporation; Larry Elgin Gray; Michael Wayne Jackson; Richard Michael Savage; Sean Trevor Doutre; Dean Deluca; William Buckley; and Deborah Mattingly.**

Civ. No. 86–5051.

United States District Court, W.D. Arkansas, Fayetteville Division.

Jan. 29, 1987.

John Wesley Hall, Jr. and Larry D. Vaught, Hall & Vaught, Little Rock, Ark., for plaintiff.

S. Hubert Mayes, Jr., Laser, Sharp & Mayes, Little Rock, Ark., for Soldier of Fortune Magazine, Inc. and Omega Group, Ltd.

Timothy W. Floyd, University of Georgia School of Law Legal Aid and Defender Society, Athens, Ga., for defendant Sean T. Doutre.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is a lawsuit in which plaintiff, Norman Douglas Norwood, seeks damages against defendant, Soldier of Fortune Magazine, Inc., and several individual defendants because of injuries suffered by him allegedly as the result of several attempts by some of the individual defendants to injure or murder him. It is alleged that

these attempts on his life were the result of two separate conspiracies formed between defendant, Larry Elgin Gray, and other individual defendants after Gray responded to two separate advertisements which ran in the Soldier of Fortune Magazine, a magazine with national circulation.

It is undisputed that during the year 1985 Soldier of Fortune Magazine ran two advertisements, one for defendant Savage, and one for defendant Jackson. The Savage ad read as follows:

GUN FOR HIRE: 37 year-old—professional mercenary desires jobs. Vietnam Veteran. Discreet and very private. Bodyguard, courier, and other special skills. All jobs considered. Phone (615) 891–3306 (I–03).

The ad for defendant Jackson was:

GUN FOR HIRE. NAM sniper instructor. SWAT. Pistol, rifle, security specialist, body guard, courier plus. All jobs considered. Privacy guaranteed. Mike (214) 756–5941 (101).

It is claimed in the amended complaint that a number of attempts were made upon Norwood's life as a result of Gray contacting other of the defendants through the advertisements, and hiring them to kill Norwood. It is alleged that at least one of these attempts resulted in personal injuries to Norwood when he was shot and wounded by two of the individual defendants, acting in behalf of Gray.

Defendant Soldier of Fortune Magazine has filed a motion for summary judgment. Its contention, as set forth in its brief, is:

Defendants contend that the language of these advertisements is subject to the privilege of the First Amendment of the United States Constitution and therefore cannot be made the subject of a state cause of action for civil damages. Specifically, Defendants allege that under the provisions of the First Amendment, these particular advertisements run by Soldier of Fortune are absolutely privileged against the present suit for damages.

It is argued by this defendant that: "the sole question in this case is simply whether or not the above quoted advertisements are a clear and unambiguous solicitation to engage in an illegal transaction." In other words, defendants would make the issue for this court to determine to be a simple one. Are the advertisements illegal or legal? If they are legal, so the defendant argues, the advertisements, irrespective of the consequences flowing from them, are absolutely privileged by reason of the provisions of the First Amendment.

Surprisingly, the plaintiff, in his brief, seems to agree that this is the dispositive issue before the court. The court does not at all agree.

In support of its position, defendant contends:

The constitutional privilege attached to the First Amendment carries with it the right to be shielded from civil suits for damages which just as surely would suppress or hinder the First Amendment rights, as would direct state intervention. See, e.g., *New York Times Company v. Sullivan*, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710. Indeed, in the protection of First Amendment privileges, the Courts have gone so far as to recognize that mere negligence in the exercise of these rights creates no state cause of action for damages. See, e.g., *Rosenblatt v. Baer*, 383 U.S. 75, 15 L.Ed.2d 597, 86 S.Ct. 669.

The court is convinced that this interpretation of the cases cited by defendant attempts to carry them far beyond their boundaries. In the first place, unlike *Sullivan, supra,* and *Rosenblatt, supra,* this is not a case in which a court is required to determine the extent to which constitutional protections for speech and press limit a state's power to award damages in a libel action brought by a public official against critics of his official conduct. Instead, this is, at best, "commercial speech." As the court pointed out in *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981): "The extension of First Amendment protections to purely commercial speech is a relatively recent develop-

ment in First Amendment jurisprudence. Prior to 1975, purely commercial advertisements of services or goods for sale were considered to be outside the protection of the First Amendment." *Id.* at 505, 101 S.Ct. at 2891 (citing *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942)). In *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the court held that even speech proposing no more than a commercial transaction enjoys a substantial degree of First Amendment protection. However, in *Metromedia, Inc. v. San Diego, supra,* the Court, in reference to that opinion, said:

That decision, however, did not equate commercial and non-commercial speech for First Amendment purposes; indeed, it expressly indicated the contrary. (citations omitted). Although the protection extended to commercial speech has continued to develop, commercial and non-commercial communications, in the context of the First Amendment, have been treated differently.... However, we continued to observe the distinction between commercial and non-commercial speech, indicating that the former could be forbidden and regulated in situations where the latter could not be. (citations omitted).

*Id.* 453 U.S. at 505, 101 S.Ct. at 2891.

As was pointed out by Justice Stevens in his opinion in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 69 n. 32, 96 S.Ct. 2440, 2452 n. 32, 49 L.Ed.2d 310 (1976), the difference between commercial price and product advertising and ideological communication permits regulation of the former "that the First Amendment would not tolerate with respect to the latter."

Thus, it is clear that it is inappropriate, to say the least, to equate the issue with which the Court was dealing in *New York Times Co. v. Sullivan, supra,* with the issue in this case. In *Sullivan,* one of three elected commissioners of the city of Montgomery, Alabama, was awarded a jury verdict of $500,000 on his libel suit

against the newspaper as the result of an alleged libelous advertisement run by the "Committee To Defend Martin Luther King and the Struggle For Freedom in the South." The advertisement contained rather unspecific charges about the treatment of students in Montgomery, Alabama, without naming plaintiff Sullivan. The trial judge submitted the case to the jury under instructions that statements in the advertisement were "libelous per se" and that the jury could find for the plaintiff simply by finding that the defendant newspaper had published the advertisements and that the statements were made "of and concerning" plaintiff. The Court stated:

Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

*Id.* 376 U.S. at 270, 84 S.Ct. at 721.

Even though the Court obviously believed that it was considering a weighty and important issue to the republic, it still did not rule that newspapers that criticize public officials can never be sued and are never responsible for their actions. Instead, it held that a newspaper could not be sued by a public official who believes that he has been libeled by newspaper articles about the public job that he was doing unless "he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279, 84 S.Ct. at 725. *Rosenblatt, supra,* also cited by the defendant, does nothing more than attempt to apply the *Sullivan* holding, and does not, in this court's view, lend defendant any additional comfort.

▮ If this court were to accept the argument of defendant, it is obvious that it would take the *Sullivan* holding far beyond the intended result. Defendant contends that its "gun for hire" advertisements are absolutely privileged. The court

understands that to mean that, irrespective of how a jury might view defendant's alleged conduct in this case, the First Amendment still will not allow the plaintiff to expect the defendant to answer in damages for its conduct. That simply cannot be the law, and the court does not believe that *Sullivan, supra,* and *Rosenblatt, supra,* can be stretched to the point argued by defendant, even in a "public official case" such as those two cases were, and certainly not in a "commercial speech" case.

Since the United States Supreme Court first recognized, or at least began to develop, "free speech" in *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), it has recognized that this right was not so absolute that it could be exercised, in all circumstances, and in all events, with no responsibility for the consequences. As Justice Holmes said in *Schenck, supra:* "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."

It should be pointed out that, even though defendant argues, and plaintiff seems to agree, that this is a case in which the court has to determine whether the "speech" exercised by the defendant can be regulated to any degree, the court simply does not believe that that is the issue. Mr. Norwood is not attempting to have defendant enjoined from exercising its right to run advertisements such as those in question. Instead, he is simply asking that a jury, after a trial, award him damages for the consequences of those advertisements. Thus, the cases cited by both plaintiff and defendant on the permissible boundaries of regulation of First Amendment rights simply do not apply.

As the authors in 16A Am.Jur.2d, *Constitutional Law* § 506 at 343, point out:

Although freedom of speech or of the press under constitutional guaranties may not be altogether restrained, he who abuses the right may nevertheless be held to liability therefor. The First Amendment does not confer an absolute right to speak or publish, without responsibility, whatever one may choose. The extraordinary protections afforded by the First Amendment's guaranty of free speech and press carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly, a duty widely acknowledged but not always observed by editors and publishers. It does no violence to the value of freedom of speech and press to impose a duty of reasonable care upon those who would exercise such freedoms; the states have a substantial interest in encouraging speakers to carefully seek the truth before they communicate, as well as in compensating persons actually harmed by false descriptions of their personal behavior. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.

The United States Supreme Court, more than once, has recognized this principle. In *Kovacs v. Cooper,* 336 U.S. 77, 88, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949), Justice Reed, writing for the Court, said: "To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself."

In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court rather emphatically stated: "The Court has emphasized that '[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.'" *Id.* at 683, 92 S.Ct. at 2657 (citing *Associated Press v. NLRB,* 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953 (1937).

The argument that the news media is absolutely shielded by the First Amendment from suits by persons who claim that they have been wronged or have suffered damages to their property by actions of the news media was answered by the Supreme Court in *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). In that case Hugo Zacchini, the great "Human Cannonball," sued the operator of a television sta-

tion because it filmed and showed in its entirety on television his performance at a county fair in Ohio. The entire performance (from the time that he was propelled from the end of the cannon until he hit the net some 200 feet away), occupied approximately 15 seconds. At his first performance at the fair, he noted that an employee of the defendant had a camera and was preparing to film his act. He requested that defendant's employee refrain from doing so, and his performance was not filmed the first night. The next day, on direct orders from the producer of the television station's newscast, the employee returned and videotaped the act. This performance was shown, in its entirety, on the eleven o'clock news program that night. Plaintiff sued, contending that defendant's conduct was an "unlawful appropriation of plaintiff's professional property." Summary judgment was granted by the trial court, but the Court of Appeals of Ohio reversed, finding that the First Amendment did not privilege the press to show the entire performance on a news program without compensating the plaintiff for any financial injury he could prove at trial. The Ohio Supreme Court, although agreeing that the plaintiff had the right to the publicity value of his performance under Ohio law, reversed, believing that the First Amendment gave the television station an absolute privilege to report on its newscast matters of legitimate public interest. The Supreme Court granted certiorari, 429 U.S. 1037 (1977), and on appeal the television station argued that the First Amendment shielded it from suit because it had a privilege granted by that amendment to film and televise petitioner's performance, relying on *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), and *New York Times Co., supra*. The Court, after distinguishing *Time, Inc., supra*, pointed out, in words appropriate to this case, that: "Indeed, in the present case petitioner did not seek to enjoin the broadcast of his act; he simply sought compensation for the broadcast in the form of damages." *Zacchini*, 433 U.S. at 574, 97 S.Ct. at 2856. The Court left little doubt that different stan-

dards are to be applied in cases such as *New York Times Co., supra*, involving defamation of a public official, and cases such as *Zacchini*, and, by inference, the one before this court, involving acts which have not received the level of protection afforded public official defamation cases. The Court said:

> Nor does it appear that our later cases, such as *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 [91 S.Ct. 1811, 29 L.Ed.2d 296] (1971); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789] (1974); and *Time, Inc. v. Firestone*, 424 U.S. 448 [96 S.Ct. 958, 47 L.Ed.2d 154] (1976), require or furnish substantial support for the Ohio court's privilege ruling. These cases, like *New York Times*, emphasize the protection extended to the press by the First Amendment in defamation cases, particularly when suit is brought by a public official or a public figure. None of them involve an alleged appropriation by the press of a right of publicity existing under state law.

433 U.S. at 574, 97 S.Ct. at 2856.

Thus, defendant's reliance upon *New York Times, supra*, and *Rosenblatt, supra*, is clearly misplaced. Defendant did not, in the advertisements in question, engage in public debate of any kind. What it did, instead, in both advertisements, is advertise a "gun for hire." It let its readers know that the individual who turned out to be Savage claimed to be a "professional mercenary" and a "Vietnam Veteran." It informed them that any inquiries would be "discreet and very private" and that "all jobs [would be] considered." In Jackson's ad it informed its readers, which allegedly turned out to include defendant Gray, that Jackson, a "NAM sniper instructor" had his gun for hire and that all jobs would be considered and that he would guarantee privacy. It is likely that most citizens would believe that that is a far cry from the type of responsible public debate which the United States Supreme Court obviously intends to foster by cases such as *New York Times, supra*.

The plethora of individual rights which we have in this nation of free men is undoubtedly a source of our strength, but in a sense, is also a source of, or at least the catalyst for, significant lawlessness that pervades our society. While few of us would want to change our system which protects such a large array of "rights," it may be that we have more than most of us need, and more than is good for a majority of us. We have the right to "bear arms" and with that right has come personal ownership of a veritable flood of weapons of almost every description, many of which are designed to, and have no other purpose than to, "hurt people." We have the right to have "gun shows" in public buildings at which we show, trade and sell these tools of destruction.

Perhaps, those of us who are particularly skilled in the use of these weapons have a right to advertise our skills with the hope and intent that others of us who need these skills will give us employment. It may very well be, as defendant argues, that the state could not absolutely prohibit the "speech" which defendant engaged in unless it could be said that such speech concerned unlawful activity or was misleading. Plaintiff Norwood is not asking that defendant's speech be curtailed. Instead, he is asking that this court require the defendant to answer in damages for the exercise of its right because such exercise caused him to suffer personal injury and, thus, substantial damages.

More than 200 years ago, when the First Amendment to our Constitution was no more than a gleam in the eye of our founding fathers, if that, Sir William Blackstone, as if to answer the argument made by defendant in 1987, said:

> The liberty of the press is indeed essential to the nature of a free state, but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matters when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press; but if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity.... 34 W. Blackstone *Commentaries* at 1326.

Defendant magazine exercised one of the myriad of rights which the "press" has been given by our system. If a jury believes after a trial of this case, that the exercise of that right infringed the equally important rights of the plaintiff, it is only fair that defendant "take the consequences of (its) own temerity."

■ In addition to its First Amendment argument, defendant also argues that plaintiff cannot recover because it was not foreseeable that the injuries which plaintiff allegedly suffered would result from the advertisements. In the first place, the court believes that a reasonable jury could conclude that an equally reasonable magazine publisher should have foreseen, when he allowed an advertisement for a "gun for hire" by a "professional mercenary," and a "NAM sniper instructor" who would consider "all jobs" and who would keep all inquiries "discreet and very private," that someone might be hurt by that gun if it was hired. Reasonable jurors might conclude that a reasonable person shouldn't be especially surprised when he learns that the gun that had been hired through his advertisement was used to do one of the things that guns often do and are designed to do—hurt people.

Defendant argues that it has the right to assume that others will obey the law, and that it is not foreseeable that lawbreakers will partake of the services so freely advertised in its magazine. In *Franco v. Bunyard*, 261 Ark. 144, 547 S.W.2d 91 (1977), *cert. denied,* 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1978), the plaintiff's decedent was shot and killed while working at a Safeway store in Springdale by an escaped convict who had, prior to his escape, been serving a life sentence for kidnapping. The day before the robbery of the store and the shooting of plaintiff's decedent the escaped convict had purchased a second-hand pistol from the defendant at his place of business in Rogers, Arkansas. It was

claimed that the seller of the firearm had violated certain federal statutes and federal regulations in that proper identification was not required prior to the sale and certain forms were not completed. The trial court granted summary judgment on the grounds of lack of foreseeability. The Arkansas Supreme Court reversed, holding that:

> Thus, had the law been obeyed, he could not have obtained possession of the gun and could not have used it to shoot innocent men the next day. On the issue of foreseeability, we need to say only that the very purpose of the law is to keep pistols out of the hands of such persons as Graham, who was both a convicted criminal and a fugitive from justice. It certainly cannot be said that his use of the gun in such a way as to injure others was not foreseeable. Of course, it is not required that the precise sequence of events leading to the injury be foreseeable. *Helena Gas Co. v. Rogers,* 104 Ark. 59, 147 S.W. 473 (1912).

The court finds that the alleged consequences of defendant's conduct in this case are at least as foreseeable as that of the gun seller in *Franco*.

This is a Rule 56 motion for summary judgment. Since such motions are drastic remedies, they "should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2712 at 588; *Inland Oil and Transport Co. v. United States,* 600 F.2d 725 (8th Cir.1979). While this may no longer be the rule in view of *Anderson v. Liberty Lobby, Inc., supra,* as is pointed out in 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2712 at 583, some courts, including the Court of Appeals for the Eighth Circuit, have held that summary judgments are not to be granted where there is "the slightest doubt" as to the facts. *Traylor v. Black, Sivalls & Bryson, Inc.,* 189 F.2d 213 (8th Cir.1951).

In any event, the rule at least is that a trial court is not to grant a summary judg-

ment unless it can say that a reasonable jury could not find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court believes that a reasonable juror could find that advertisements such as those described above had a substantial probability of ultimately causing harm to some individual. In fact, if the allegations are true, these advertisements caused harm not only to the plaintiff, but to several other individuals.

Looking at this case in the light that it must on a Rule 56 motion, the court cannot say that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Instead, for the reasons set forth above, the court believes, based on the record before it, that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc., supra.* The motion for summary judgment will be denied by separate order entered concurrently herewith.