**PEOPLES BANK & TRUST COMPANY OF MOUNTAIN HOME, Conservator of the Estate of Nellie Mitchell, an Aged Person, Plaintiff,**

v.

**GLOBE INTERNATIONAL, INC. d/b/a "Sun", Defendant.**

Civ. No. 91–3001.

United States District Court,
W.D. Arkansas,
Harrison Division.

Feb. 21, 1992.

Phillip H. McMath, McMath Law Firm, Little Rock, Ark., Roy E. Danuser, Mountain Home, Ark., for plaintiff.

Phillip S. Anderson, John E. Tull, Williams & Anderson, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### I. *Statement of the Case*

The plaintiff, Peoples Bank and Trust Company of Mountain Home, conservator of the estate of Nellie Mitchell, an aged person, by amended complaint filed September 24, 1991, brought defamation, invasion of privacy, and intentional infliction of emotional distress claims against the defendant, Globe International, Inc. d/b/a "*Sun*". Mrs. Mitchell is a 96–year–old resident of Mountain Home, Arkansas. She has operated a newsstand on the town square since 1963. Prior to that she delivered newspapers on a paper route, and according to the evidence, still makes deliveries to certain "downtown" business establishments and select customers.

It appears that Nellie, as she is known to almost everyone in this small Ozark Mountain town, is a town "landmark" or "treasure". She has cared for herself and raised a family as a single parent for all of these years on what must have been the meager earnings of a "paper girl." According to the evidence, the newspaper stand which she operates was once a short, dead end alley between two commercial buildings on the town square. She apparently gained permission to put a roof over the alley and this became her newsstand and sole source of livelihood, apparently providing life's necessities for her and her family to this day. When one of the lawyers asked Nellie during the course of her testimony

whether she lived with her adult daughter, Betty, she quickly replied, "No, Betty lives with me."

The basis of the plaintiff's claims is an article and picture that appeared in the October 2, 1990, edition of the *Sun*. The October 2 edition published a photograph of the plaintiff in conjunction with a story entitled:

### SPECIAL DELIVERY

**World's oldest newspaper carrier, 101, quits because she's pregnant!**
*I guess walking all those miles kept me young*

The "story" purports to be about a "papergal Audrey Wiles" in Stirling, Australia, who had been delivering papers for 94 years. Readers are told that Ms. Wiles became pregnant by "Will" a "reclusive millionaire" she met on her newspaper route. "I used to put Will's paper in the door when it rained, and one thing just kind of led to another."

In words that could certainly have described Nellie Mitchell, the article, which was in the form and style of a factual newspaper account, said:

[S]he's become like a city landmark because nearly everyone at one time or another has seen her trudging down the road with a large stack of papers under her arm.

A photograph of Nellie, apparently "trudging down the road with a large stack of papers under her arm" is used in conjunction with the story. The picture used in the October 2 edition of the *Sun* had been used by the defendant in a reasonably factual and accurate article about Mrs. Mitchell published in another of the defendant's publications, the *Examiner*, in 1980.

The case was tried to a jury in Harrison, Arkansas, December 2 to December 4, 1991. The jury found that the defendant's conduct had invaded Mrs. Mitchell's privacy by placing her in a false light and had amounted to an intentional infliction of emotional distress. The jury awarded the plaintiff $650,000 in compensatory damages and $850,000 in punitive damages. The jury rendered a verdict in favor of the defendant on the defamation claim. Judg-

ment was entered against the defendant on the jury verdict.

Pending before the court is defendant's motion for judgment as a matter of law or, alternatively, for remittitur of the jury award or, alternatively for new trial. Enforcement of the judgment has been stayed pursuant to Rule 62 pending the court's disposition of the defendant's motion. Fed. R.Civ.P. 62. The motion will be denied for the reasons set forth below.

### II. Motion for Judgment as a Matter of Law

Because of recent amendments to Rule 50, what were formerly motions for judgment notwithstanding the verdict are now motions for judgment as a matter of law. Fed.R.Civ.P. 50. Both the rule itself and the notes regarding the 1991 amendments indicate that, although the terminology is different, the standard remains the same.

The Court of Appeals for the Eighth Circuit, the court whose decisions are binding on this one, has said in *Jeanes v. Milner*, 428 F.2d 598 (8th Cir.1970), that motions for judgment notwithstanding the verdict should be sparingly granted because to do so deprives the parties of their right to a jury trial. The test which this court must follow in ruling on the motion for judgment notwithstanding the verdict is well stated in 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2524 (1971) as follows:

The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. In determining whether the evidence is sufficient, the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead, it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

(Citing numerous cases, including cases from the Court of Appeals for the Eighth Circuit.)

The Court of Appeals for the Second Circuit, in *Simblest v. Maynard*, 427 F.2d 1 (2nd Cir.1970), stated the test that is to be applied in words that have been oft repeated:

> Simply stated, it is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

The Court of Appeals for this circuit, in *Brown v. Missouri Pacific R.R.*, 703 F.2d 1050, 1052 (8th Cir.1983) stated that the standard to be applied by both trial courts and courts of appeals is:

> In ruling on a motion for judgment n.o.v., the courts (a) consider the evidence in the light most favorable to the plaintiffs as the verdict-winning parties, (b) assume that the jury resolved all conflicts of evidence in favor of the plaintiffs, (c) assume as true all facts which the plaintiffs evidence tended to prove, (d) give the plaintiffs the benefit of all favorable inferences which may reasonably be drawn from proved facts and (e) deny the motion if in light of the above reasonable jurors could differ as to the conclusions that could be drawn from the evidence.

■ Defendant argues it is entitled to judgment as a matter of law on both the intentional infliction of emotional distress claim (tort of outrage) and the invasion of privacy claim. With respect to the outrage claim, it is argued that there was no evidence of extreme and outrageous conduct or extreme emotional distress.

In *Ross v. Patterson*, 307 Ark. 68, 817 S.W.2d 418 (1991) the Arkansas Supreme Court stated as follows:

We have taken a very narrow view of claims for the tort of outrage, also known as the intentional infliction of emotional distress, . . . and we continue to do so here.

\* \* \* \* \* \*

In *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988) (citing *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980)), we stated that one is subject to liability for outrage if he or she willfully or wantonly causes severe emotional distress to another by extreme and outrageous conduct: conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society. Furthermore, the emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984).

*Ross*, 307 Ark. at 70–71, 817 S.W.2d 418. The court further noted that establishing the tort requires clear-cut proof. *Id.* at 71, 817 S.W.2d 418.

Testimony at trial indicated that most of the defendant's articles are created "TOH" or "top of the head", in the words of John Vadar, editor of the *Sun*. That is, the authors, none of whom use their real name, are given a headline and a picture and then "make up" the accompanying stories. In fact, according to the evidence, the editor and perhaps others "make up" a series of headlines for stories to appear in each issue, and they are placed on a table. The "reporters" or perhaps, according to defendant's contentions at the trial, their "authors of fiction" select from this list the stories they wish to write.[1]

---

1. In this respect, Paul Greenberg, Pulitzer-prize winning journalist testified in a deposition used as evidence in this case, while being questioned by defendant's attorney:

    Q. If the author testifies that he made up a story, isn't that fiction?
    A. Sir, it's false. All things that are false are not necessarily fiction.

    Q. Tell me the difference between "false" and "fiction."
    A. I can give you an illustration. William Faulkner wrote fiction. *Pravda* published falsehoods.

John Vadar, indicated that, when the picture of Mrs. Mitchell was selected, it was assumed she was dead. The *Sun*'s stated policy was to illustrate its articles with pictures of individuals from other countries who would not be damaged by the publication being circulated in the United States. The use of Mrs. Mitchell's picture was merely a "mistake."

Although defendant's contention during the trial was that Nellie Mitchell could not have been defamed because the publication contained only fiction readily recognized as such by reasonable readers, some of its "authors" testified that some of the articles were factual or at least based on fact, and it became obvious that even they could not tell the difference. Some of defendant's own witnesses could not agree which articles were purely fantasy and which were true or at least had some factual basis. For example, at trial Mr. Silver testified that an article about a farmer becoming a millionaire by making whips for wife beaters was a true story while Mr. Levy, also a witness for the defendant, stated the story was false.

With regard to the extent of emotional distress suffered by Mrs. Mitchell, she testified that she was mad, upset, embarrassed, and humiliated by the article. Further, Mrs. Mitchell indicated she had been teased about being pregnant. Betty Mitchell, Nellie Mitchell's daughter, testified that her mother "almost suffered a stroke." There was also testimony to the effect that Mrs. Mitchell attempted to buy up the papers so others could not see them.

Defendant seems to equate the phrase "extreme emotional distress" with the existence of objective evidence that an individual suffered emotional distress. Defendant argues that Mrs. Mitchell never went to a doctor, didn't miss work, and in general did not alter her normal daily activities.

A similar argument was addressed by the Arkansas Supreme Court in *Growth Properties I v. Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984) in connection with an appeal from a verdict rendered in a tort of outrage case. The court in *Growth* stated as follows:

Appellants' first two points for reversal may be treated as one—that it was error to award either compensatory or punitive damages in the absence of proof of actual damage. They submit that none of the appellees testified to any loss or injury "except rather vague references to feeling bad about it, or being 'heartsick'." But the answer to the argument lies in the fact that the essence of the tort of outrage is the injury to the plaintiff's emotional well-being because of outrageous treatment by the defendant. If the conduct is sufficiently flagrant to give rise to the tort, then the injury the law seeks to redress is the anguish itself and it need not rest, parasitically, on more demonstrative loss or injury.... Hence, mental anguish itself is the actual damage, and proof of special damage in terms of out-of-pocket expenses of exact pecuniary measurement is not essential to a recovery of compensatory damages.

*Id.* at 474, 669 S.W.2d 447.

The jury heard the evidence and studied the exhibits which included the very issue of the *Sun* in which Nellie's heretofore unsullied photograph, and thus her very "being", were literally buried in what reasonable jurors might find is muck, mire and slime spewed forth by defendant, some of which is described as follows:

A front page containing Nellie's picture surrounded by headlines promising stories about:

HUSBAND & WIFE LIVE TOGETHER WITHOUT SPEAKING FOR 56 YEARS

WOMAN CLAIMS: I'M MOM OF JIM BAKKER'S LOVE CHILD

BROTHER & SISTER MARRIAGE SHOCKER—

*After 30 yrs of forbidden love, they would rather go to jail than divorce*

PARALYZED WOMAN WALKS AFTER BEING HIT BY LIGHTNING

WORLD'S MOST HONEST COP ARRESTS OWN MOTHER—We later learn it is for picking flowers in the park.

And inside pages again with Nellie's photograph buried in what appear to be news stories about:

**HIGHWAY TO HELL**—*Wicked witch casts her deadly curse on intersection mangling 21*—accompanied by graphic photographs of mangled automobiles sitting at an intersection where the "witch" had caused a serious accident.

**DRUG DEALERS' DEVIL DOGS REPLACE PIT BULLS**

**BOY, 12, GETS OWN LAWYER TO DIVORCE DAD IN CUSTODY FIGHT**

*Revealed for first time:* **CHURCHILL'S CLOSE ENCOUNTERS WITH UFO ALIENS**—the articles discloses that, although Winston Churchill implored them to do so, they declined to help the world defeat Hitler.

*Mothers describe night of terror during* ... **20–MILE RIDE WITH A HEADLESS GHOST**

**'DEAD MAN' REVIVES AS DOCS TAKE ORGANS**

**ROAD KILL CANNIBAL**—*He eats accident victims*—a news story., accompanied by a photograph of a black man whom, the story says, had applied to the government of the "African country of Swaziland" to be allowed to pick up from along roadsides and eat bodies of persons killed on the roadway. He describes the taste of human flesh, saying that the prefers adult meat because it is "firm, succulent and salty and doesn't require seasonings", while, on the other hand, "children's meat is revolting because it tastes sweet and sticks to the teeth."

**FARMER BECOMES A MILLIONAIRE MAKING WHIPS FOR WIFE BEATERS**—the story which at least one of defendant's "authors" thought to be true.

**HELL SCHOOL** ... *Where students are chained to learn and whipped if they don't read properly*

**STUDENTS KILL TEACHER WITH VOODOO DOLL**

**FARMER KILLS SELF BY BREATHING COW GAS**—*He dies with his beloved animals*

It may be, as defendant in essence argues, that Mrs. Mitchell does not show a great deal of obvious injury, but a reasonable juror might conclude, after hearing the evidence and viewing the *Sun* issue in question, that Nellie Mitchell's experience could be likened to that of a person who had been dragged slowly through a pile of untreated sewage. After that person had showered and a few weeks have passed, there would be little remaining visible evidence of the ordeal which the person had endured and the resulting damages incurred, but few would doubt that substantial damage had been inflicted by the one doing the dragging. This court is certainly in no better position to determine what that is "worth" than 8 [2] jurors picked from the citizenry of the Harrison Division of the Western District of Arkansas to hear and decide this case. The court concludes that reasonable jurors could find that it is "worth" a great deal to suddenly find your likeness buried in the slime of which this publication was made, directly in front of an article describing the relative tastiness of adult human flesh compared to that of children.

Defendant undoubtedly has the Constitutional right [3] to publish "newspaper stories," "literature," "fiction," or whatever the articles described above and others in this issue are, but when it does and damages others by doing so, our system literally demands that the injured person be adequately compensated in an attempt to make them whole, or as whole as money can

**2.** It was the court's intent to try the case to a 6 person jury, but, because of amendments to Rule 47 of the Federal Rules of Civil Procedure which became effective on December 1, 1991, abolishing the practice of using alternate jurors, all 8 persons called deliberated and decided the case as the modified rule requires.

**3.** This court once said, in another context, that: "While few of us would want to change our system which protects such a large array of "rights," it may be that we have more than most of us need, and more than is good for a majority of us." *Norwood v. Soldier of Fortune Magazine, Inc.,* 651 F.Supp. 1397 (W.D.Ark.1987).

make them. A properly picked jury made that determination after hearing ample evidence to create a jury question, and our system does not permit this judge to substitute his judgment for that of the jury.

■ With respect to the invasion of privacy claim, defendant asserts three main arguments. Each will be addressed in turn. First, defendant argues that the invasion of privacy/false light claim should not and cannot be used as an alternative tort to circumvent the constitutional protections afforded defendants in defamation cases. Defendant has referred the court to various discussions concerning the problems with the two related claims, *i.e.* false light and defamation.

In particular, defendant suggests the court should follow the rationale of the North Carolina Supreme Court and not allow plaintiff to circumvent the constitutional protections due *Globe* by relying upon the alternative claim of invasion of privacy. The North Carolina Court in *Renwick v. News & Observer Publishing Co.*, 310 N.C. 312, 312 S.E.2d 405 (1984), *cert. denied,* 469 U.S. 858, 105 S.Ct. 187, 83 L.Ed.2d 121 (1984), refused to recognize false light invasion of privacy where the evidence would not support a libel action. Defendant also cites California cases applying a similar approach.

In *Renwick* the North Carolina Supreme Court refused to expand the tort of invasion of privacy to include "false light" invasions of privacy. The court held that a plaintiff must recover in such situations, if at all, in an action for libel or slander. In doing so, the court cited two basic concerns. "First, any right to recover for a false light invasion or privacy will often either duplicate an existing right of recovery for libel or slander or involve a good deal of overlapping with such rights. Second, the recognition of a separate tort of false light invasion of privacy, to the extent it would allow a recovery beyond that permitted in actions for libel or slander, would tend to add to the tension already existing between the First Amendment and the law of torts in cases of this nature." There is

an annotation discussing the *Renwick* case and others. *See Annotation, False light invasion of privacy—cognizability and elements,* 57 A.L.R.4th 22 (1987).

Regardless of the merits of the concerns voiced by the defendant and the North Carolina Court, the Arkansas Supreme Court has specifically adopted a cause of action for false light invasion of privacy and has held that both a defamation claim and a false light claim may be brought in the same suit. In *Dodrill v. Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979), *cert. denied,* 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980), the court referring to the Restatement (Second) of Torts § 652A (1977) noted that the conduct constituting invasion of privacy could be broken down into four separate categories. One of those categories is false light. *See also Dunlap v. McCarty,* 284 Ark. 5, 678 S.W.2d 361 (1984) (four categories or invasion of privacy recognized).

In the *Dodrill* case the plaintiff had asserted both a defamation claim and a false light invasion of privacy claim. The court noted that "[t]he invasion of privacy claim stands upon a different footing than the defamation claim." *Dodrill,* 265 Ark. at 637, 590 S.W.2d 840. The court further noted:

> The right to recover for an invasion of privacy is conditioned upon the complaining party's demonstrating that (1) the false light in which he was placed by the publicity would be highly offensive to a reasonable person, and (2) that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed....
>
> A cause of action both for "false light" invasion of privacy and for defamation can be joined in the same action.... However, there can be but one recovery for any particular publication....

*Dodrill,* 265 Ark. at 638, 590 S.W.2d 840. The court further held that in light of *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), "actual malice must be demonstrated by one seeking to recover for invasion of privacy." The

plaintiff's "burden of proof is governed by the clear and convincing evidence standard rather than by the proponderance (sic) of the evidence standard." *Dodrill*, 265 Ark. at 639, 590 S.W.2d 840. These same standards were applied more recently by the court in *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991).

■ At trial, the jury was instructed as follows on the invasion of privacy claim:

The plaintiff, Nellie Mitchell, also claims damages from the defendant for invasion of privacy by publicity which put Mrs. Mitchell in a false light. In order to prevail on this claim, the plaintiff has the burden of proving by clear and convincing evidence the following:

One, that the false light in which she was placed by the publicity would be highly offensive to a reasonable person, and

Two, that the defendant acted with actual malice in publishing the statements at issue in this case. Actual malice means that *Globe International* intended, or recklessly failed to anticipate, that readers would construe the publicized matter as conveying actual facts or events concerning Mrs. Mitchell. A finding of actual malice requires a showing of more than mere negligence.

Court's Instruction Number 12. The court believes this instruction complies with the requirements of Arkansas law and affords the defendant the constitutional protections due it.

■ Defendant's second and third arguments both concern the actual malice standard as applied in this case. Defendant concedes that the court properly instructed the jury on the definition of actual malice. However, defendant argues that there was no evidence of intentional conduct on the part of *Globe*. It is further argued that no one understood the story to state actual facts about Mrs. Mitchell. Defendant states that "[t]here is absolutely no evidence that the defendant intentionally published the article so that readers would believe that it stated actual facts concerning Mrs. Mitchell. There was no evidence that *Globe International* has conducted readership surveys or otherwise has ob-tained knowledge as to what, if anything, its readers believe to be actual facts." Defendant goes on to state that "[w]ithout clear and convincing evidence that *Globe International* or someone in its employ actually knew that the story would be understood to state *actual facts about Nellie Mitchell*, the jury's finding of actual malice is contrary to the law."

In this latter argument the defendant appears to ignore the reckless prong of the definition of actual malice. As noted *supra*, actual malice was defined as intentional conduct or conduct that "recklessly failed to anticipate, that readers could construe the publicized matter as conveying actual facts or events concerning Mrs. Mitchell."

Plaintiff argues that the defendant's method of publishing—not distinguishing between truth or fiction, off the top of their head, out of whole cloth—demonstrates at the very least reckless disregard. In fact, the defendant's method of publishing was one of the major considerations resulting in the earlier denial of defendant's summary judgment motion. *See Mitchell v. Globe International Publishing, Inc.*, 773 F.Supp. 1235, 1240 (W.D.Ark. 1991). In that opinion we stated:

The court cannot say as a matter of law that the article is incapable of being interpreted as portraying actual events or facts regarding the plaintiff. The "facts" conveyed are not so inherently impossible or fantastic that they could not be understood to convey actual facts. Nor can we say that no person could take them seriously. Moreover, even if the headline and certain facts contained in the article could not be reasonably believed other facts *e.g.*, the implication of sexual promiscuity, could reasonably be believed.

In making this determination we 'consider the surrounding circumstances in which the statements were made, the medium by which they were published and the audience for which they were intended.' *Dworkin* [*v. Hustler Magazine, Inc.*], 668 F.Supp. [1408] at 1416. The articles are written in a purportedly

factual manner. No distinction is made between those articles that are wholly fictional and the articles that are intended to be factual. Fictional articles are not denoted as such. The *Sun* apparently intends for the readers to determine which articles are fact and which are fiction or what percentage of a given article is fact or fiction.

The layout, captions, and style of writing contained in the article is similar in format to news articles. There are no cautionary statements appearing in this article or to the court's knowledge in the entire edition of the *Sun*.

*Id.*

After hearing the testimony in this case, the court believes the jury could have, and apparently did, find that the defendant intended their readers to construe the article in question as conveying actual facts or events concerning Mrs. Mitchell or at the very least that the defendant recklessly failed to anticipate that the article would be so construed. The court believes the publication methods utilized by the defendant make it reasonable for the jury to draw such a conclusion. After all, as already noted, there was evidence from which the jury could believe that defendant's own employees who actually wrote the articles, when asked, couldn't always tell the difference between fact and fantasy.

The defendant could very easily indicate to its readers in some fashion that the material conveyed in the *Sun* is fiction if it really intended that its readers recognize that the articles are false and made up

fantasy. The court believes that it could be inferred from the manner of publication that the defendant intends its readers to believe its articles are conveying actual facts or at the very least leave the reader in doubt as to what portions are factual and what portions are pure fantasy.[4]

■ Additionally, the defendant argues the jury verdicts are inconsistent since the jury found in its favor on the defamation claim. Defendant argues that it is inconsistent to find no defamation but find false light because both required a finding that the statement could be understood as describing actual facts or events concerning the plaintiff, or actual conduct of the plaintiff.[5] In the defamation claim this was made one of the essential elements of the claim. *See* Instruction Number 7. With regard to the false light claim, this requirement was incorporated into the definition of actual malice as follows: "actual malice means that *Globe International* intended, or recklessly failed to anticipate, that readers would construe the publicized matter as conveying actual facts or events concerning Mrs. Mitchell. A finding of actual malice requires more than mere negligence."

Although it is true that both defamation and false light required a similar finding that the matter could be construed as conveying actual facts or events concerning the plaintiff, the other elements of the offenses were different. False light contains only two elements: (1) that the false light in which she was placed by the publicity would be highly offensive to a reasonable person, and (2) actual malice as defined

---

4. Although the court would certainly not allow a newspaper poll to affect in any way its judgment in this matter, it is interesting to note the responses to a poll contained in the December 10, 1991, issue of the *Arkansas Democrat–Gazette*. Readers were asked: "Do you believe the stories in the supermarket tabloids are real?" The response: Yes—53.1%, No—46.9%. While the article reporting the poll contained the disclaimer that it did not purport to be a "scientific survey and reflects only the opinion of those who choose to participate", it at least indicates that over one-half of those who bothered to respond either believed articles in supermarket tabloids to be true or lied about it. It, of course, might be that only people who read and believe

supermarket tabloids respond to call in telephone polls.

5. Defendant advances various arguments regarding the court's rulings on the defamation claim. In particular, defendant once again argues that Ms. Mitchell is a public figure. The court does not believe Ms. Mitchell is a public figure within the meaning of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) or *Dodrill v. Ark. Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979). There is no evidence that Ms. Mitchell took any affirmative steps to attract public attention. However, even if the defendant is correct on this point the issue has been mooted by the verdict returned on the defamation claim.

*supra.* Instruction 12. While the defamation claim was broken down into six elements as follows: (1) that the defendant published a defamatory statement, as I will define that term for you; (2) that the statement was of and concerning the plaintiff—that is, that the statement referred to the plaintiff or was otherwise identified with her; (3) that the statement could reasonably be understood as describing actual facts or events concerning the plaintiff, or actual conduct of the plaintiff; (4) that the statement was false; (5) that the defendant was negligent in publishing the statement; and (6) that the publication of the statement was a proximate cause of actual damage to the plaintiff. The definition of defamatory statement, Instruction Number 8, stated, *inter alia,* "a publication is defamatory if it exposes a person to public hatred, contempt and ridicule, or if it causes him or her to be shunned or avoided. In other words, a statement is defamatory if it tends to harm the reputation of that person so as to lower him or her in the esteem of the community, or to deter others from associating or dealing with him or her."

The jury could easily have found the statements at issue to be highly offensive and yet not defamatory as the term was defined. Additionally, the two torts, although very similar, do protect, or at least are meant to protect, different interests.

Finally, the defendant argues it is entitled to judgment as a matter of law on the false light invasion of privacy claim because plaintiff voluntarily agreed to the use of her photograph. It is contended that once a party has consented to the use of her photograph she cannot complain about the context in which it was used. In support, defendant cites *Brewer v. Hustler Magazine,* 749 F.2d 527 (9th Cir.1984); *Falwell v. Penthouse,* 521 F.Supp. 1204 (W.D.Va.1981); *Ann Margret v. High Society Magazine, Inc.,* 498 F.Supp. 401 (S.D.N.Y.1980).

At trial we did not submit an invasion of privacy claim based on appropriation of Mrs. Mitchell's likeness. The use of the photograph alone would probably not support an invasion of privacy claim because the photograph involved was taken in a public place and portrayed nothing to shock the ordinary sense of decency or propriety *i.e.* the photograph did not disclose anything which until then had been private. However, plaintiff's false light invasion of privacy claim was based on more than just the use of the photograph. It was plaintiff's contention that the photograph *in conjunction with* the article placed her in a false light. Thus, this case can be distinguished from those cited by the defendant.

The court believes and finds that there was ample evidence to warrant submission of this issue to the jury. Certainly, reasonable minds could differ and the court will not substitute its own judgment for that of the jury.

### III. *Motion for Remittitur*

"[T]he proper role of the federal courts in reviewing the size of jury verdicts is a matter of federal law." *American Business Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir.1986). A jury verdict is reviewed under Federal Rules of Civil Procedure 50(b) and 59, "which permit the court to interfere with a verdict, under Rule 50, only where no substantial evidence is offered on which the jury can base its award, ... and, under Rule 59, only where the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95, 107 (4th Cir. 1991) (*citations omitted*).

"A district court should grant remittitur only when the verdict is so grossly excessive as to shock the court's conscience." *American Business Interiors v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir.1986). The court, however, is "guided by the law of the forum state in weighing the excessiveness of a verdict." *Id.* In *Jenkins v. McLean Hotels, Inc.,* 859 F.2d 598 (8th Cir.1988), the court stated "[a] verdict may not be considered to be excessive unless there is 'plain injustice' or a 'monstrous' or 'shocking' result." *Id.* at 600 (*quoting Stafford v. Neurological Medicine, Inc.,* 811 F.2d 470, 475 (8th Cir.1987)).

■ Moreover, the review by a federal court is subject to the Seventh Amendment constraints guaranteeing the right to a jury trial which are not imposed on any state-prescribed post-trial review. The Seventh Amendment does not permit a federal court to substitute its judgment for that of a jury, as long as the jury operates within the constraints of the law and the evidence. *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991).

Wright & Miller provides the following discussion on the review of a federal court on the size of the verdict:

> The court always may grant relief if the verdict is excessive or inadequate as a matter of law, but this is not the limit of the court's power. It also may grant a new trial if the size of the verdict is against the weight of the evidence.
>
> This is merely a special application of the general power of the trial court to set aside a verdict that is against the weight of the evidence.... The court is not free to set aside the verdict merely because the judge might have awarded a different amount of damages, but it may do so if the proceedings have been tainted by appeals to prejudice or if the verdict, in light of the evidence, is so unreasonable that it would be unconscionable to permit it to stand. The phrase "shocks the conscience of the court" is much used in the current cases but adds very little by way of guidance. The power exists in the trial judge whether the verdict is unreasonably high or unreasonably low.

11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2807 (1973) (citations and footnotes omitted).

■ Defendant argues there is no evidence to support the award of $650,000 in compensatory damages. We are informed that this is the highest award in Boone county history and it is also the highest jury award for compensatory damages in a defamation, invasion of privacy, or outrage case in the history of the State of Arkansas. Defendant provides the court with a comparison of awards made in other cases. (Defendant's brief at 4). Without intend-ing to be flippant, the court's response is, "so what?" As far as those same records show, there has never before been a case like this in Boone County or the State of Arkansas.

It is defendant's contention that this award for mental anguish shocks the conscience of the court or demonstrates passion or prejudice. In *St. Louis S.W. Ry. Co. v. Pennington*, 261 Ark. 650, 553 S.W.2d 436 (1977), the court stated that " 'a reversal or reduction of an award for mental anguish would be in order when it: (1) Shocks the conscience of the court ... (2) Demonstrates passion or prejudice on the part of the jury.'" *Id.* at 679, 553 S.W.2d 436. Although the *Pennington* case was a wrongful death action, the court indicated that this was the same test it utilized in reviewing other damage awards.

As at trial, the defendant contends that the wrongful death standard of requiring more than normal grief or more than normal mental anguish should be applied in this case. Aside from wrongful death actions and the tort of outrage, the Arkansas courts have not required extreme mental anguish before an award of damages is appropriate. With regard to the tort of outrage the court has stated that "the emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it." *Ross v. Patterson*, 307 Ark. 68, 71, 817 S.W.2d 418 (1991) (*citing Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984)). The *Ross* court further noted that "the tort of outrage is not easily established and required clear-cut proof; merely describing the conduct as outrageous does not make it so." *Id.*

In general awards for mental anguish or pain and suffering are left to the discretion of the jury since these are highly subjective elements of damage and are extremely hard to quantify. *See, e.g., Jenkins v. McLean Hotels, Inc.*, 859 F.2d 598 (8th Cir. 1988) ("Awards for pain and suffering are highly subjective and the assessment of damages is within the sound discretion of the jury, ... especially when 'the jury must determine how to compensate an individual for an injury not easily calculable in economic terms.'") (citations omitted).

The jury in this case was required to quantify damages for mental distress. We believe there is no basis on which to determine what portion, if any, of the damages awarded should be remitted. To do so would merely be a substitution of this judge's judgment for that of the jury. As the cases cited *supra,* including *Growth Properties,* note mental anguish is an element of damage that is not easily susceptible to measurement in economic terms.

■ Defendant also argues that in the absence of intentional conduct by *Globe* the plaintiff may not recover for emotional distress unless such distress is accompanied by physical injury. The physical impact/injury limitation, however, does not apply to the claims involved herein because each required either actual malice, intentional, or reckless conduct. *See e.g. Growth Properties I v. Cannon,* 282 Ark. 472, 669 S.W.2d 447 (1984); *Olan Mills, Inc. v. Dodd,* 234 Ark. 495, 499, 353 S.W.2d 22 (1962). *See also* Howard W. Brill, *Arkansas Law of Damages* § 4–7 (2d Ed.1990).

Defendant also argues that the award of $850,000 punitive damages reflects passion and prejudice. At trial after the jury returned its verdict on the liability and compensatory damage aspects of the case, it was given a separate instruction listing various considerations that could be utilized in determining the amount of punitive damages to be awarded. *See* Court's Instruction Number 26. The instruction was crafted to include the criteria approved in *Haslip* and criteria traditionally applied by the Arkansas courts. *See Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *Mattison v. Dallas Carrier Corp.,* 947 F.2d 95 (4th Cir.1991); *Robertson Oil Company v. Phillips Petroleum Co.,* 930 F.2d 1342 (8th Cir.1991); *O'Neal Ford, Inc. v. Davie,* 299 Ark. 45, 49, 770 S.W.2d 656 (1989); *W.M. Bashlin Co. v. Smith,* 277 Ark. 406, 423, 643 S.W.2d 526 (1982); *Matthews v. Rodgers,* 279 Ark. 328, 651 S.W.2d 453 (1983).

In reviewing the propriety of the punitive damage award it is appropriate to consider the *Haslip* factors and those utilized by the Arkansas courts. In this case the jury found that the defendant committed intentional torts, one of them requiring a finding of actual malice. Additionally, the ratio of punitive to compensatory damages does not suggest excessiveness.

Even if this court would, if it had been the trier of fact, have awarded less damages, that is not sufficient for the court to substitute its judgment for that of the jury. The court would only be speculating as to what is "right" if it were to reduce the verdicts. The court cannot say that the verdicts "shock the conscience of the court."

### IV.  *Motion for New Trial*

As to the motion for a new trial, this court has frequently expressed its concern and uncertainty about the standard to be applied in view of what appears to be the inconsistencies and ambiguities engendered by cases decided by various panels of the Court of Appeals for the Eighth Circuit. For a complete discussion of this court's understanding in this respect, *see* our opinion in *U.S. v. Schay,* 746 F.Supp. 877 (E.D.Ark.1990).

It would serve no useful purpose to reiterate the statements made in that opinion or to cite the cases cited. Suffice it to say that there is ample basis for this trial court to believe that this circuit is at least committed to the proposition that trial courts shall not grant new trials on the basis of the weight of the evidence unless the court can say that the jury verdict is against the "clear weight", "overwhelming weight", or "great weight" of the evidence, and there is even a basis in at least a couple of Eighth Circuit cases indicating that the burden may be heavier than that. *See* our discussion in *Schay, supra,* at 881 and the cases cited therein.

The court believes and finds that there was ample evidence to support the jury's verdict in this case. Certainly, reasonable minds may differ, and the verdict was not against the "clear weight", "overwhelming weight", or "great weight" of the evidence.

Even if the rule followed in this circuit was the traditional one that trial courts may weigh the evidence and grant a new trial to prevent a miscarriage of justice

even where there is substantial evidence to support the jury verdict, this court would still deny the motion. The court believes the evidence created a jury question that was determined by the jury adversely to the defendant. The court cannot say that a miscarriage of justice took place.

As to the claim that the motion should be granted because the court erred in admitting the testimony concerning professional journalism guidelines, the court believes, for the reasons stated on the record at the time, that such testimony was admissible. Fed.R.Evid. 401 and 403. The court will not address individually the remaining arguments raised by the defendant. Suffice it to say that the court has carefully considered the defendant's arguments and believes for the reasons stated on the record at trial that the defendant is entitled to no relief.

### V.  *Conclusion*

For the reasons stated herein the defendant's motion will be denied.